# UNITED STATES BANKRUPTCY COURT
### District of Colorado

| | | |
|---|---|---|
| In re: Lake Loveland Dermatology, P.C. | | Case No. 19-11659 MER |
| Debtor. | | Chapter 11 |
| Lake Loveland Dermatology, P.C., Skin, P.C., Kevin John Mott, | | Adv. Case No. ____-MER |
| Plaintiffs, v. | | |
| Patrick Lillis, Tracy Amick, | | |
| Defendants. | | |

## COMPLAINT

Plaintiffs Lake Loveland Dermatology, P.C., Skin, P.C., and Dr. Kevin John Mott, by and through their respective undersigned counsel, hereby submit this Adversary Complaint against Defendants Patrick Lillis and Tracy Amick:

### JURISDICTION AND VENUE

1. Jurisdiction is conferred on this Court pursuant to the provisions of Section 1334(a) of Title 28 of the United States Code in that this proceeding arises in and is related to the above captioned Chapter 11 and concerns property of the Debtor in that case.

2. This Court has both personal and subject matter jurisdiction to hear this case pursuant to Section 1334 of Title 28 of the United States Code and Section 157(b)(2) of Title 28 of the United States Code.

3. This Court has supplemental jurisdiction to hear all state law claims pursuant to Section 1367 of Title 28 of the United States Code and has specific jurisdiction to hear the fraudulent conveyance claim pursuant to Sections 544 and 548 of Title 11 of the United States Code.

4. This adversary proceeding is a core proceeding under 28 U.S.C. §157.

5. This matter is primarily a core proceeding and therefore the Bankruptcy Court has jurisdiction to enter a final order. However, in the event this case is determined to be a noncore proceeding then, and in that event, LLD, Skin, and Dr. Mott consent to the entry of a final order by the Bankruptcy Judge.

6. Venue is proper in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7. Lake Loveland Dermatology, P.C. ("LLD") is a professional corporation with its principal office located at 776 West Eisenhower Blvd., Loveland, Colorado 80537.

8. Skin, P.C. ("Skin") is a professional corporation with its principal office located at 905 Alpine Avenue, Boulder, CO 80304.

9. Kevin Mott ("Dr. Mott") is an individual with a residential address of 9676 Mountain Ridge Drive, Boulder, CO 80302.

10. Defendant Patrick Lillis ("Lillis") is an individual who resides in Colorado at 4845 Valley Oak Drive, Loveland, Colorado 80538.

11. Defendant Tracy Amick ("Amick") is an individual who resides in Colorado at 4845 Valley Oak Drive, Loveland, Colorado 80538.

## GENERAL ALLEGATIONS

12. LLD is a dermatology clinic based in Loveland, Colorado with several satellite offices throughout the state.

13. LLD filed a voluntary petition for Chapter 11 bankruptcy on March 8, 2019. *In re Lake Loveland Dermatology, P.C.*, 19-11659-MER (Bankr. D. Colo.).

14. LLD remains a debtor in possession and is in operation of its business.

15. Skin is a Colorado professional corporation with a primary place of business in Boulder, Colorado.

16. Skin filed a voluntary petition for Chapter 11 bankruptcy on March 8, 2019. *In re Skin, P.C.*, 19-11650-MER (Bankr. D. Colo.).

17. Skin remains a debtor in possession and is in operation of its business.

18. Dr. Mott filed a voluntary petition for Chapter 11 bankruptcy on March 8, 2019. *In re Dr. Kevin John Mott*, 19-11647-MER (Bankr. D. Colo.).

2

19. Dr. Mott remains a debtor in possession.

20. LLD, Skin, and Dr. Mott's respective Chapter 11 cases are being jointly administered.

21. LLD was formed by Lillis in 1979 who, at the time, was a medically licensed dermatologist.

22. Beginning in September 2010, Lillis engaged in a series of substance abuse infractions that ultimately led to him relinquishing his medical license on October 20, 2016.

23. On September 17, 2010 Lillis was stopped by law enforcement and ultimately charged with a DUI to which he pleaded guilty.

24. The Colorado Medical Board (the "Board") upon learning of the criminal case initiated disciplinary proceedings against Lillis which resulted in Lillis receiving a Letter of Admonition. The Board also placed Lillis on probation for 5 years, and during this time Lillis agreed to totally abstain from the use of alcohol.

25. In May of 2014 the Board received information that Lillis was using alcohol in violation of the terms of his probation, and required him to submit to a urine test, which he failed. The Board suspended Lillis's medical license on July 25, 2014.

26. On August 26, 2014 Lillis and the Board entered into a "Non-Disciplinary Interim Cessation of Practice Agreement" in which Lillis agreed that he had violated probation by, *inter alia*, using alcohol on four occasions in April and May of 2014. Lillis again agreed to another 5-year term of probation in which he agreed to abstain from using alcohol.

27. On October 5, 2015 Lillis provided a urine sample that tested positive for alcohol.

28. The Board suspended his medical license again on October 20, 2015.

29. With his license suspended, Lillis was not permitted to practice medicine.

30. Rather than suffer a diminution in income due to the suspension of his medical license, between October 2015 and October 2016, Lillis caused LLD to pay him approximately $1,000,000 as an "officer's salary."

31. Prior to the suspension of his license, Lillis had not drawn an officer's salary. One million dollars annually was an unreasonable amount to pay himself.

The minimal work Lillis performed for LLD did not justify a salary remotely approximating $1,000,000.

32. LLD did not receive reasonably equivalent value in exchange for paying Lillis a $1,000,000 officer's salary.

33. LLD became insolvent as a result of paying Lillis a $1,000,000 officer's salary.

34. Lillis, who was an insider under an employment contract with LLD, caused LLD to incur the obligation to pay Lillis a $1,000,000 officer's salary.

35. LLD did not receive reasonably equivalent value in exchange for incurring the obligation to pay Lillis a $1,000,000 officer's salary.

36. LLD became insolvent as a result of incurring the obligation to pay Lillis a $1,000,000 officer's salary.

37. Because Lillis caused LLD to pay him a $1,000,000 officer's salary, payment of LLD's outstanding debts were delayed.

38. Two physicians employed by LLD—Dr. Mahlberg and Dr. Joseph Lillis—objected to Lillis causing LLD to pay him $1,000,000 as an officer's salary.

39. In retaliation, in July 2016, Lillis caused LLD to terminate its relationship with Dr. Mahlberg and Dr. Joseph Lillis.

40. Dr. Mahlberg and Dr. Joseph Lillis generated the majority of LLD's revenue. As a result of their termination, LLD's revenues substantially decreased.

41. On August 19, 2016 the Board reviewed new information pertaining to Lillis's conduct, and referred the matter to the Office of the Attorney General.

42. On September 28, 2016, Lillis and the Board entered into a Stipulation and Final Agency Order in which Lillis agreed to surrender his medical license.

43. Because only licensed physicians may own medical practices, after he relinquished his license, Lillis was required to sell LLD to a licensed medical practitioner to avoid forfeiting the practice entirely.

44. Lillis, however, intended to subvert the orders of the Board by selling LLD under terms that would permit Lillis to extract all of the economic benefit from LLD, as if he were the owner, while propping up another physician as the nominal owner.

45. Dr. Mott was an unwitting victim of this scheme.

46. Lillis approached Dr. Mott, the president and sole shareholder of Skin, about Skin purchasing LLD.

47. Lillis called Dr. Mott in a panic and informed him that he had to take over the practice immediately, because Lillis had failed another UA and would now receive the "death penalty" from the Board.

48. Dr. Mott had been employed as a dermatologist at LLD since June 1, 2016.

49. To capture all of the future economic benefit of LLD, Lillis fraudulently inflated LLD's value.

50. Due to the departure of Dr. Mahlberg and Dr. Joseph Lillis, and the deterioration of goodwill caused by Lillis's suspension and ultimate surrender of his license, the value of LLD had dropped precipitously by October 2016.

51. As of September 30, 2016, LLD was worth between $1,170,000 and $1,293,000.

52. Lillis, however, presented Skin and Dr. Mott with false financials intended to support Lillis's fabricated practice value of $8,759,000.

53. To prevent Dr. Mott and Skin from conducting adequate due diligence, Lillis insisted that time was of the essence because at any moment the Board would close the practice and thereby prevent its sale and render it unable to provide patient care.

54. When Dr. Mott indicated that he intended to hire counsel at Caplan & Earnest to represent him in the transaction, Lillis informed Dr. Mott that there was not enough time for Dr. Mott to select counsel of his choosing, and that he, Lillis, would choose a lawyer to represent Dr. Mott in the transaction. This is in fact what happened.

55. In addition to selecting Dr. Mott's lawyer, Lillis also encouraged Dr. Mott and Skin to rely on Lillis's estimate of the practice's value.

56. Because Lillis had owned and operated LLD since its inception and was fully apprised of its financial condition, Dr. Mott and Skin relied on Lillis's representation of value.

57. At the time that Lillis informed Dr. Mott and Skin that LLD was valued at $8,759,000, Lillis knew such representation to be false. Lillis knew that LLD was worth substantially less than $8,759,000.

58. In reliance on Lillis's materially false representation, including materially inaccurate financial statements, Skin agreed to purchase LLD for $8,759,000.

59. In reliance on Lillis's materially false representation, Dr. Mott agreed to guaranty Skin's obligations with respect to the sale.

60. The accompanying promissory note between Skin and Lillis (the "Note") provided that the purchase price was to be paid by Skin pursuant to a ten-year schedule.

61. However, prior to and up to the execution of the Note and Guaranty, Lillis assured Dr. Mott and Skin that, based on LLD's historical performance, Skin would have no difficulty satisfying its obligations under the Note.

62. Lillis assured Dr. Mott that, based on LLD's historical performance, Dr. Mott would never be called upon to satisfy his guaranty.

63. Lillis represented to Dr. Mott that, based on LLD's historical performance, Dr. Mott would receive over $1,000,000 per year in compensation.

64. Skin was the borrower under the Note.

65. Dr. Mott personally guaranteed the Note.

66. The Note was unsecured.

67. At no time did LLD have any obligation with respect to the Note.

68. The parties agreed that the Note would be paid solely out of profit distributions to Skin. As Lillis wrote to Dr. Mott, "After everyone has been paid (including you) and all your extraneous expenses, I will receive the ancillary profits for 10 years."

69. The sale closed on October 16, 2016 with the execution of a stock purchase agreement, and Skin, thereafter, became the owner of LLD.

70. Skin received less than reasonably equivalent value in exchange for the obligation to repay the Note.

71. Skin became insolvent as a result of the obligation to repay the Note.

72. Skin did not have the ability to make payments on the Note as they came due.

73. Dr. Mott received less than reasonably equivalent value in exchange for the obligation to guarantee repayment of the Note.

6

74. Dr. Mott became insolvent as a result of the obligation to guarantee repayment of the Note.

75. At Lillis's insistence, LLD agreed to retain Lillis as its Chief Operating Officer pursuant to an executed employment agreement.

76. Throughout his tenure as Chief Operating Officer, Lillis had signatory authority on LLD's bank accounts.

77. Throughout his tenure as Chief Operating Officer, Lillis had authority to initiate wire transfers from LLD's bank accounts.

78. Throughout his tenure as Chief Operating Officer, Lillis had authority to direct LLD's accountants to make transfers from LLD's bank accounts.

79. Amick is Lillis's spouse.

80. At Lillis's insistence, LLD agreed to retain Amick as its Office Manager.

81. As LLD's Office Manager, Amick was responsible for maintaining the accuracy of LLD's books and records.

82. As LLD's Office Manager, Amick had custody of LLD's books and records.

83. As LLD's Office Manager, Amick had authority to direct LLD's accountants with respect to accounting for LLD's transactions.

84. As LLD's Office Manager, Amick had signatory authority on all but one of LLD's accounts.

85. As LLD's Office Manager, Amick had authority to, and in fact did, choose which obligations LLD would pay in a given month.

86. As LLD's Office Manager, Amick was required to approve all payments made by LLD.

87. At the time of the sale from Lillis to Skin, LLD had approximately $250,000 of outstanding debt.

88. For the first six months following the sale—from November 2016 through April 2017—Skin made no payments on the Note.

89. For the first six months following the sale—from November 2016 through April 2017—LLD had no profit to distribute to Skin. After paying down its historical debt and paying essential vendors, LLD had no profit to distribute to Skin.

90. As Chief Operating Officer, Lillis had visibility into all of LLD's financial affairs.

91. As Office Manager, Amick had visibility into all of LLD's financial affairs.

92. Lillis and Amick concluded in April 2017 that, for the foreseeable future, LLD would not be in a position to make distributions to Skin. Specifically, given LLD's historical and projected revenue, its overhanging debt obligations, and its cost of operations, it was highly unlikely that LLD would have profit to distribute to Skin within any discernable period of time.

93. Therefore, Lillis and Amick concluded in April 2017 that Skin would not be able to make payments on the Note.

94. Lillis did not declare a default on the Note in April 2017.

95. Lillis did not call upon Dr. Mott to satisfy his guaranty in April 2017.

96. Instead, Lillis and Amick devised a scheme to cause LLD to pay Skin's obligations under the Note.

97. Lillis and Amick's scheme entailed LLD making payments to Lillis out of LLD's revenue before LLD paid its legitimate debts or paid vendors for its cost of operations.

98. As Chief Operating Officer, Lillis used his control over LLD's accounts to cause LLD to transfer LLD's funds to Lillis via wire transfer and other means in satisfaction of Skin's monthly payment obligations.

99. Lillis was not authorized to cause LLD to transfer LLD's funds to Lillis in satisfaction of Skin's monthly payment obligations.

100. Amick knew that Lillis was causing LLD to transfer LLD's funds to Lillis in satisfaction of Skin's monthly payment obligations while other creditors went unpaid.

101. To assist Lillis, Amick used one or more computers or computer servers to intentionally misrepresent the nature of these transfers in LLD's books.

102. To assist Lillis, Amick used one or more computers to intentionally cause LLD's accountants to inaccurately reflect the nature of these transfers.

103. To assist Lillis, Amick used one or more computers and used interstate wires to intentionally cause LLD to transfer funds to Lillis.

8

104. While serving as Chief Operating Officer, with Amick's knowing and substantial assistance, Lillis caused LLD to transfer $449,887 to Lillis in satisfaction of Skin's monthly payment obligations.

105. At times, because Lillis caused LLD to transfer funds to him, LLD was forced to delay its payroll by weeks.

106. Each month that Lillis caused LLD to transfer money to Lillis in satisfaction of Skin's monthly payment obligations, payments to countless creditors were not made or delayed, often by many months, as Lillis deprived LLD of the funds to make such payments.

107. By February 2018, LLD had over $150,000 in outstanding obligations to vendors.

108. Lillis resigned as LLD's Chief Operating Officer.

109. Amick resigned as LLD's bookkeeper.

110. LLD hired Pinnacle Healthcare Consulting ("Pinnacle") on March 7, 2018, to take over the operational and financial management of the practice.

111. During the transition from Lillis and Amick's practice management to Pinnacle, Lillis and Amick provided training to Pinnacle representatives.

112. As part of this training, Lillis and Amick instructed Pinnacle to continue to pay the Note from LLD's funds before LLD paid any other vendor or creditor.

113. Lillis and Amick instructed LLD's accountants to continue to pay the Note from LLD's funds before LLD paid any other vendor or creditor and to continue to inaccurately reflect the nature of these transfers.

114. Lillis and Amick were not authorized to instruct Pinnacle or LLD's accountants to continue to pay the Note from LLD's funds before LLD paid any other vendor or creditor.

115. Given that Lillis had managed LLD since its inception, that Lillis was the outgoing Chief Operating Officer, and that Amick was the outgoing Office Manager, Pinnacle had no reason to question the accuracy or validity of Lillis's instructions.

116. Unaware that Lillis and Amick had provided materially misleading directives, Pinnacle proceeded to cause LLD to make payments as instructed by Lillis.

117. Lillis continued to accept payments from LLD knowing that LLD had no obligation to make payments on the Note.

118. Lillis continued to accept payments from LLD knowing that, as a result of paying Lillis first, LLD was unable to pay its obligations to creditors as they came due.

119. By way of example only, specific instances of where this occurred include, but are not limited to:

   a. Mod Med-Billing Services, one of LLD's vendors, had a $20,006.45 bill due on May 11, 2018. Because of Note payments LLD made to Lillis, LLD did not have the funds to pay the bill in full until July 12, 2018.

   b. Mod Med-Billing Services had a $21,165.48 bill due on September 1, 2018. Because of Note payments LLD made to Lillis, LLD did not have the funds to pay the bill in full until October 25, 2018.

   c. Merz Aesthetics, one of LLD's vendors, had a $2,478.66 bill due on November 22, 2018. Because of Note payments LLD made to Lillis, LLD did not have the funds to pay the bill in full until January 8, 2019.

   d. Foundation Care, one of LLD's vendors, had a $9,261.16 bill due on December 26, 2018. Because of Note payments LLD made to Lillis, LLD did not have the funds to pay the bill in full until February 5, 2019.

120. Like the creditors and vendors mentioned above, payments made to Pinnacle under its executory contract with LLD were often delayed because of Note payments LLD made to Lillis.

121. For instance, on June 11, 2018, Pinnacle had a bill in the amount of $14,583.33 due. Because of Note payments LLD made to Lillis, LLD was unable to pay the bill in full until August 28, 2018. On July 30, 2018, Pinnacle had a bill in the amount of $14,583.33 due. Because of Note payments LLD made to Lillis, LLD was unable to pay the bill in full until August 28, 2018. On August 11, 2018, Pinnacle had a bill in the amount of $14,583.33 due. Because of Note payments LLD made to Lillis, LLD was unable to pay the bill in full until September 28, 2018. On August 31, 2018, Pinnacle had a bill in the amount of $15,963.33 due. Because of Note payments LLD made to Lillis, LLD was unable to pay the bill in full until October 9, 2018.

122. Pursuant to Lillis and Amick's instructions, Pinnacle caused LLD to make at least $540,949.84 in Note payments to Lillis.

123. In total, Lillis and Amick caused LLD to make at least $990,836.84 in improper Note payments to Lillis.

124. Additionally, throughout his tenure as Chief Operating Officer, upon information and belief, Lillis caused LLD to make additional payments either to himself or for his benefit that were unauthorized by LLD and unearned by Lillis.

125. Lillis and Amick's conduct directly benefited Lillis, relieved Skin from making payments that it was obligated to make on the Note, and has caused, and continues to cause, LLD, Skin, and Dr. Mott significant financial harm, leading to the filing of the Chapter 11 petitions.

### FIRST CLAIM FOR RELIEF
### (Fraudulent Conveyance, 11 U.S.C. § 548(a)(1)(A), LLD against Lillis)

126. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

127. Starting in May 2017, Lillis intentionally caused LLD to make payments to himself before LLD paid outstanding obligations to other creditors.

128. Lillis engaged in this conduct with actual intent to hinder or delay LLD's known and existing creditors.

129. Lillis's actions in fact hindered and delayed LLD's known and existing creditors.

130. LLD may avoid such transfers in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF
### (Fraudulent Conveyance, 11 U.S.C. § 544(b)(1), Skin against Lillis)

131. Skin realleges and reincorporates all prior allegations as if fully set forth herein.

132. Lillis caused Skin to incur an obligation that is voidable under C.R.S. § 38-8-105(1)(b).

133. Skin may avoid such obligation in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Fraudulent Conveyance, 11 U.S.C. § 544(b)(1), Dr. Mott against Lillis)

134. Dr. Mott realleges and reincorporates all prior allegations as if fully set forth herein.

135. Lillis caused Dr. Mott to incur an obligation that is voidable under C.R.S. § 38-8-105(1)(b).

136. Dr. Mott may avoid such obligation in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Conveyance, 11 U.S.C. § 544(b)(1), LLD against Lillis)

137. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

138. Lillis caused LLD to make transfers that are voidable under C.R.S. § 38-8-105(1)(a).

139. LLD may avoid such transfers in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Fraudulent Conveyance, C.R.S. § 38-8-105(1)(a), LLD against Lillis)

140. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

141. Lillis caused LLD to make transfers to himself with actual intent to hinder and delay creditors.

142. LLD is entitled to a judgment for one and one-half the value of the assets transferred.

## SIXTH CLAIM FOR RELIEF
### (Fraudulent Conveyance, C.R.S. § 38-8-105(1)(b), Skin against Lillis)

143. Skin realleges and reincorporates all prior allegations as if fully set forth herein.

144. Skin incurred an obligation to Lillis without receiving reasonably equivalent value.

145. Skin incurred such obligation when it reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

146. Skin is entitled to avoid the obligation in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Fraudulent Conveyance, C.R.S. § 38-8-105(1)(b), Dr. Mott against Lillis)

147. Dr. Mott realleges and reincorporates all prior allegations as if fully set forth herein.

148. Dr. Mott incurred an obligation to Lillis without receiving reasonably equivalent value.

149. Dr. Mott incurred such obligation when he reasonably should have believed that he would incur debts beyond its ability to pay as they became due.

150. Dr. Mott is entitled to avoid the obligation in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
### (Contract Reformation, Skin against Lillis)

151. Skin realleges and reincorporates all prior allegations as if fully set forth herein.

152. Due to circumstances beyond Skin's control, which are substantially and materially different than what Skin reasonably anticipated, Skin's performance under the Note has become unreasonably burdensome.

153. Such materially different circumstances were not caused by any fault on the part of Skin.

154. Due to these materially different circumstances, the benefits to be achieved through the purchase of LLD via the Note are not justified by their burdens.

155. These circumstances are vitally different from what was within the contemplation of Skin when it purchased LLD via the Note.

156. The Note should therefore be reformed by reflecting an original principal balance of $1,170,000 with credit given for all payments already made thereunder.

### NINTH CLAIM FOR RELIEF
### (Contract Reformation, Dr. Mott against Lillis)

157. Dr. Mott realleges and reincorporates all prior allegations as if fully set forth herein.

158. Due to circumstances beyond Dr. Mott's control, which are substantially and materially different than what Dr. Mott reasonably anticipated, Dr. Mott's performance under the personal guaranty has become unreasonably burdensome.

159. Such materially different circumstances were not caused by any fault on the part of Dr. Mott.

160. Due to these materially different circumstances, the benefits to be achieved through the purchase of LLD are not justified by the burdens of the personal guaranty.

161. These circumstances are vitally different from what was within the contemplation of Dr. Mott when he agreed to personally guaranty the Note.

13

162. The personal guaranty should therefore be reformed by reflecting an expiration date of March 8, 2019, after which Dr. Mott has no further obligations thereunder.

## TENTH CLAIM FOR RELIEF
### (Civil Theft, C.R.S. § 18-4-401, LLD against Lillis)

163. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

164. While acting as Chief Operating Officer of LLD, Lillis knowingly exercised control over LLD's funds.

165. Without LLD's authorization, Lillis knowingly exploited his control over LLD's funds by causing LLD to transfer $449,887 to Lillis.

166. Moreover, throughout his tenure as Chief Operating Officer, upon information and belief, Lillis caused LLD to make additional payments either to himself or for his benefit that were unauthorized by LLD.

167. Lillis intended to permanently deprive LLD of these transferred funds.

168. LLD was in fact permanently deprived of such funds as a result of Lillis's conduct.

169. LLD has been damaged by Lillis's theft in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty, LLD against Lillis)

170. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

171. As Chief Operating Officer, Lillis owed fiduciary duties to LLD.

172. Lillis breached his fiduciary duties to LLD by, among other things, causing LLD to pay Skin's debt, causing LLD to pay Lillis instead of paying LLD's creditors and vendors, and, upon information and belief, causing LLD to make additional payments either to himself or for his benefit that were unauthorized by LLD.

173. Lillis's conduct caused LLD significant financial loss and it caused LLD to fall behind on payments to creditors and vendors, ultimately culminating in LLD's petition for Chapter 11 bankruptcy.

174. LLD has been damaged by Lillis's breach of fiduciary duty in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF
### (Unjust Enrichment, LLD against Lillis)

175. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

176. Lillis caused LLD to make at least $990,836.84 in improper Note payments to Lillis.

177. Skin, not LLD, was required to make Note payments to Lillis.

178. Lillis knew that LLD was in no way required to make Note payments to Lillis but nevertheless caused LLD to do so.

179. Lillis received the benefit of the Note payments at LLD's expense.

180. Moreover, upon information and belief, Lillis caused LLD to make additional payments either to himself or for his benefit that were unauthorized by LLD.

181. Given that LLD was not required to make such Note payments to Lillis nor make additional payments either to Lillis or for Lillis's benefit, it would be unjust for Lillis to retain those benefits.

182. Lillis has been unjustly enriched in an amount to be proven at trial.

## THIRTEENTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty, LLD against Amick)

183. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

184. Amick knew that Lillis, as Chief Operating Officer, owed fiduciary duties to LLD.

185. Amick knew that Lillis was causing LLD to transfer funds to Lillis to which Lillis was not entitled.

186. Amick knew that Lillis was breaching his fiduciary duties to LLD by causing LLD to transfer funds to Lillis to which Lillis was not entitled.

187. Amick substantially assisted Lillis helping to facilitate the transfers, by causing LLD's books to conceal the true nature of the transfers to Lillis, by causing LLD's accountants to inaccurately account for the transfers to Lillis, and by

instructing Pinnacle to cause LLD to make payments to Lillis in satisfaction of Skin's obligations.

188. Amick's conduct caused LLD to suffer damages in an amount to be proven at trial.

### FOURTEENTH CLAIM FOR RELIEF
### (Civil Conspiracy, LLD against Lillis and Amick)

189. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

190. Lillis and Amick agreed to accomplish the object of causing LLD to illicitly transfer funds to Lillis without authorization in purported satisfaction of Skin's obligations.

191. Lillis and Amick agreed to cause LLD to transfer funds to Lillis in satisfaction of Skin's monthly payment obligations.

192. Lillis and Amick engaged in one or more unlawful overt acts in furtherance of this conspiracy, including without limitation theft, wire fraud, and computer crimes.

193. Lillis and Amick's conspiracy caused LLD to be damaged in an amount to be proven at trial.

### FIFTEENTH CLAIM FOR RELIEF
### (Violation of the Colorado Organized Crime and Control Act, C.R.S. § 18-17-104(3), LLD against Lillis and Amick)

194. LLD realleges and reincorporates all prior allegations as if fully set forth herein.

195. Lillis is a "person" within the meaning of C.R.S. § 18-17-104(3).

196. Amick is a "person" within the meaning of C.R.S. § 18-17-104(3).

197. LLD is an "enterprise" within the meaning of C.R.S. § 18-17-104(3).

198. Lillis and Amick were employed by or associated with LLD.

199. Lillis and Amick knowingly conducted or participated, directly or indirectly, in LLD through a pattern of racketeering activity, including without limitation by engaging in at least two of the following acts related to the conduct of LLD, which acts damaged LLD in an amount to be proven at trial:

    a. Theft (C.R.S. § 18-4-401)

    b. Wire Fraud (18 U.S.C. § 1343)

    c. Computer Crime (C.R.S. § 18-5.5-101, *et seq*.).

WHEREFORE, Plaintiffs pray that the Court:

a)     Enter judgment in their favor and against Defendants Lillis and Amick as set forth in this Complaint;

b)     Award Plaintiffs all damages as allowable by law, including punitive damages and treble damages, in an amount to be proven at trial;

c)     Award Plaintiffs prejudgment interest, post judgment interest, costs, and attorney fees;

d)     Award Plaintiffs such other relief as the Court deems just and proper.

Dated this 2nd day of May 2019.

Respectfully submitted,

Allen Vellone Wolf Helfrich & Factor P.C.

*/s/ Michael Gilbert*
Jordan Factor, Esq.
Michael Gilbert, Esq.
Jeremy T. Jonsen, Esq.
1600 Stout Street, Suite 1100
Denver, Colorado 80202
Phone Number: (303) 534-4499
jfactor@allen-vellone.com
mgilbert@allen-vellone.com
jjonsen@allen-vellone.com

**COUNSEL FOR LAKE LOVELAND DERMATOLOGY, P.C.**

Kutner Brinen, P.C.

/s/ *Lee M. Kutner*
Lee M. Kutner, Esq.
1660 Lincoln Street, Suite 1850
Denver, CO 80264
Phone Number: (303) 832-2400
lmk@kutnerlaw.com

**COUNSEL FOR SKIN, P.C.**

Goff & Goff LLC

/s/ *Lance J. Goff*
Lance J. Goff, Esq.
3015 47th Street, Suite E-1
Boulder, CO 80301
Phone Number: (303) 415-9688
lance@goff-law.com

**COUNSEL FOR KEVIN JOHN MOTT**